# UNITED STATES COURT OF INTERNATIONAL TRADE

## BEFORE: THE HONORABLE MARK A. BARNETT, JUDGE

—————————————————————————— x
: 
UNICATCH INDUSTRIAL CO., LTD., and : 
TC INTERNATIONAL, INC., : 
: 
                   Plaintiffs, : 
: 
        and : 
: 
PRIMESOURCE BUILDING PRODUCTS, INC., : 
: 
              Plaintiff-Intervenor, : 
: 
         v. :         Court No. 20-00079
: 
UNITED STATES, : 
: 
           Defendant, :       **PUBLIC VERSION**
: 
        and : 
: 
MID CONTINENT STEEL & WIRE, INC., : 
: 
          Defendant-Intervenor : 
—————————————————————————— x

## PLAINTIFFS' REPLY TO DEFENDANT AND DEFENDANT-INTERVENORS RESPONSE TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

Ned H. Marshak
Max F. Schutzman
Dharmendra N. Choudhary
Andrew T. Schutz
Eve Q. Wang

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW -Suite 650
Washington, D.C. 20005
(202) 783-6881

*Counsel for Plaintiffs Unicatch Industrial
Co., Ltd. and TC International, Inc.*

Dated: May 7, 2021

# TABLE OF CONTENTS

ARGUMENT ......................................................................................................................... 1

   I.   THE DEPARTMENT'S DECISION TO CALCULATE UNICATCH'S NORMAL
VALUE BASED ON HOME MARKET SALES PRICES, RATHER THAN
CONSTRUCTED VALUE, IS  NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND
IS  CONTRARY TO LAW ...................................................................................................... 1

   II.     COMMERCE'S CALCULATION OF FREIGHT REVENUE IS NOT SUPPORTED
BY SUSTANTIAL EVIDENCE AND IS CONTRARY TO LAW .......................................... 5

   III.    COMMERCE'S SELECTION OF STEEL WIRE ROD PRICES PAID TO
AFFILIATED SUPPLIERS TO CALCULATE "TOTCOM" IS NOT SUPPORTED BY
SUBSTANTIAL EVIDENCE AND IS CONTRARY TO LAW ............................................. 8

CONCLUSION ..................................................................................................................... 9

# TABLE OF AUTHORITIES

**Cases**

*Baoding Mantong Fine Chemistry Co. v. United States*, 113 F. Supp. 3d 1332 (Ct. Int'l Trade 2015) ........................................................................................................................ 5

*Viraj Grp., Ltd. v. United States*, 26 C.I.T. 290 (2002) ................................................ 5

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ............. 4

**Other Authorities**

STATEMENT OF ADMINISTRATIVE ACTION, H.R. Rep. No. 103-316 (1994) as reprinted in 1994 U.S.C.C.A.N. 4040 .................................................................................................... 3, 4

**Administrative Decisions**

*Certain Steel Nails From Taiwan: Final Results of Antidumping Duty Administrative Review and Partial Rescission of Administrative Review; 2016-2017,* 84 Fed. Reg. 11,506-01 (Mar. 27, 2019) ................................................................................................................ 7

*Notice of Final Results and Partial Rescission of Antidumping Duty Administrative Review: Certain Oil Country Tubular Goods from Mexico*, 71 Fed. Reg. 54,614 (Sept. 18, 2006) ........ 8

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE MARK A. BARNETT, JUDGE

```
_____x
                                        :
UNICATCH INDUSTRIAL CO., LTD., and      :
TC INTERNATIONAL, INC., ET AL,          :
                                        :
                        Plaintiffs,     :
                                        :
                                        :
                v.                      :        Court No. 20-00079
                                        :
                                        :        PUBLIC VERSION
UNITED STATES,                          :
                                        :
                        Defendant,      :
_____x
```

## PLAINTIFFS' REPLY TO DEFENDANT AND DEFENDANT-INTERVENORS RESPONSE TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

Plaintiffs, Unicatch Industrial Co., Ltd. and TC International, Inc. (collectively, "Unicatch"), submit this Reply to Defendant, the United States ("Government" and "Gov. Br.") and Defendant-Intervenors, Mid Continent Steel & Wire, Inc. ("Mid Continent" and "Mid Continent Br.") Responses to Plaintiffs' Motion for Judgment on the Agency Record ("Unicatch Brief" and "Unicatch Br.").

## ARGUMENT

I.      **THE DEPARTMENT'S DECISION TO CALCULATE UNICATCH'S NORMAL VALUE BASED ON HOME MARKET SALES PRICES, RATHER THAN CONSTRUCTED VALUE, IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS CONTRARY TO LAW**

The facts in this case, as discussed in Unicatch's Brief, are not in dispute. The

Department of Commerce ("Commerce") found that Unicatch had a viable home market. It then

rejected [    ] of Unicatch's home market sales because they were below cost, leaving [       ] of its home market sales ([            ]), equal to [    ] of its U.S. sales ([               ]), to calculate margins.  **CD 267, 3887540-01** (Commerce Preliminary Calculation Memorandum at 65, 454); **CD 295, 3904515-01** (Unicatch Case Brief at 1, 2, 4-5).

Commerce compared one home market observations, seq. [    ], consisting of [      ] kg, to [    ] U.S. transactions, containing [            ] kg. The margin for these sales was [    ] and the extended margin was [          ], equal to [        ] of Unicatch's total extended margin ([           ]). Commerce compared a second home market sale, seq. [    ], consisting of [     ] kg to [    ] U.S. observations consisting of [        ] kg. The extended margin for this sale was [            ], equal to [     ] of Unicatch's total extended margin. *See* **CD 267, 3887540-01** (Commerce Preliminary Calculation Memorandum at 65, 134, and 454); **CD 295, 3904515-01** (Unicatch Case Brief at 1, 2, and 4-5). In other words, two home market sales, totaling [        ] kg – equal to [      ] of Unicatch's above-cost home market sales ([          ]), [         ] of Unicatch's total home market sales ([           ]) and [     ] of the [    ] U.S. sales to which they were compared ([             ]) – gave rise to [         ] in dumping duty, [      ] of Unicatch's total liability.

Commerce relied on this methodology to compute normal value in order to calculate a dumping margin for 99.5 percent of Unicatch's U.S sales. For the remaining 0.5% of U.S. Sales (equal to [       ] kg in [     ] U.S. sales observations), Commerce determined that there were no identical or similar model matches and resorted to constructed value ("CV") to calculate dumping margin. For these CV sales, Unicatch's dumping margin was [      ]. **CD 267, 3887540-01** (Commerce Preliminary Calculation Memorandum at 65, 134, 454); **CD 295, 3904515-01** (Unicatch/PT Joint Case Brief at 1, 2, 4-5). The [    ] CV margin for Unicatch in

11107606_1

POR 3 was substantially similar to Unicatch's dumping margin of 6.16% for POR 2. It also was substantially similar to margins calculated for the other mandatory respondents on POR 3, Pro-Team (6.72%, based solely on constructed value) and Liang Chyuan, 2.54%, based on a combination of constructed value and home market sales. **PD 233** (Final Results); *see also* **PD 189** (Preliminary Results).

Unicatch acknowledges that Commerce's methodology conformed to the agency's normal practice. However, as Unicatch argued in its Brief, that practice led to an unreasonable result in this case. Commerce's mandate to calculate margins on a fair and equitable basis as accurately as possible required that Commerce determine whether Unicatch had a viable home market and, accordingly, whether Commerce should rely on constructed value to calculate Unicatch's dumping margin. At the very least, Commerce failed to properly analyze the issues raised by Unicatch, which requires that this Court remand this matter to Commerce to perform the careful analysis required by law.

In its Response Brief, the Government argues that the statutory language, Statement of Administrative Action ("SAA"), and Commerce Regulations support Commerce's decision in this case. Unicatch does not dispute the fact that the Government has summarized a reasonable manner of construing the law, the SAA, and Commerce Regulations, **under normal circumstances.**

As discussed in Unicatch's Brief, the statute is ambiguous. While the Government correctly notes that the SAA provides that "the viability of a market will be assessed based on sales of all merchandise subject to an antidumping proceeding, not on a product-by-product or

model-by-model basis,"[1] the SAA also provides that the five percent test does not constitute a sacrosanct, per se rule, and that "in unusual situations, however, home market sales constituting less than five percent of sales to the United States could be considered viable and home market sales constituting more than five percent of sales to the United States could be considered not viable." STATEMENT OF ADMINISTRATIVE ACTION, H.R. Rep. No. 103-316, at 821 (1994) as reprinted in 1994 U.S.C.C.A.N. 4040 ("SAA"). The SAA reasons that the modification from prior law in the manner in which Commerce determines viability was intended to "prevent the use of 'thin' home markets as the basis for identifying dumping." *Id*. The SAA also notes that a "particular market situation" potentially would not permit a proper comparison "where a single sale in the home market constitutes five percent of sales to the United States." *Id*.

Unicatch acknowledges the reasons why Commerce normally establishes viability early in the proceeding and why it is reasonable for Commerce to apply the "normal" five percent test under normal circumstances. At the same time, however, Unicatch asks that this Court recognize that in rejecting Unicatch's claim, Commerce failed to consider the "overriding purpose" of the U.S. law; that is, "to calculate dumping margins as accurately as possible" to conform to "commercial reality." *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013).

In the instant case, the fact that Commerce's normal margin calculation methodology would lead to anomalous margins first arose when Commerce published its preliminary results. At that time, Unicatch realized that application to Unicatch's database of Commerce's below cost test (80 percent of Unicatch sales were below cost) and model match criteria ([    ] of Unicatch's U.S. sales were compared to similar, as opposed to identical, merchandise) led to

---

[1] Gov. Br. at 10-12.

margins which are commercially unreasonable. Thus, because normal viability led to inaccurate results, Unicatch asked that Commerce conform its decision to the purpose of the law. Commerce's refusal to properly consider Unicatch's position constituted an abuse of discretion, which should result in this Court remand this matter to Commerce for further analysis. The rationale which led the court to remand Commerce's decision in *Viraj Grp., Ltd. v. United States*, 26 C.I.T. 290, 294 (2002) is equally applicable to the instant case:

> The issue before this Court is whether Commerce's application of its standard currency conversion methodology resulted in an accurate dumping margin. The Federal Circuit and this Court have repeatedly acknowledged that fairness and accuracy are underlying statutory goals of dumping margin determinations. . . . Because Commerce failed adequately to explain whether its currency conversion methodology furthers the antidumping statute's requirement of a fair comparison in this dumping determination, and because other more accurate methodologies may exist to do so, this Court remands to Commerce. . . .[2]

## II. COMMERCE'S CALCULATION OF FREIGHT REVENUE IS NOT SUPPORTED BY SUSTANTIAL EVIDENCE AND IS CONTRARY TO LAW

In its Brief, Unicatch argued that Commerce erred by refusing to include as a component of gross unit price, payment of antidumping duty ("ADD") cash deposits by Unicatch customers to Unicatch. Confirmation of this failure is found in Unicatch's Section C database. For certain CEP Direct Sales (sales by TC that are shipped directly from Unicatch in Taiwan to TC's customers in the United States), Unicatch reported payments received from its U.S. customers in two fields: Field 18, GRSUPRU (gross unit price) and Field 36.1, FREIGREVU (freight

---

[2] The Government fails in its attempt to distinguish the rationale in *Baoding Mantong Fine Chemistry Co. v. United States*, 113 F. Supp. 3d 1332, 1333-1342 (Ct. Int'l Trade 2015) from the facts in this case. The fact that the *Baoding Mantong* margin was significantly higher than the Unicatch margin does not mean that the Unicatch margin was not skewed as a result of "the use of 'thin' home markets as the basis for identifying dumping."

revenue). *See* Unicatch's Section C Response at 22 and 33 (**CD 28**). The expenses included in FREIGREVU were set forth in Exhibit C-20(a),[3] reproduced below.

| | | | A | B | C | D | E | F | G=Sum(B:F)/A |
|---|---|---|---|---|---|---|---|---|---|
| Unicatch Invoice # | TC Invoice # | TC nails Invoice value ($) | Total net weight (kg from packing list) | Ocean Freight ($) | Inland Freight Port to Customer ($) | Brokerage ($) | Duty ($) | ADD ($) | Total Freight Revenue (US$/KG) |

For these sales, Unicatch billed the customer for five expenses: (1) international ocean freight, (2) U.S. brokerage, (3) U.S. inland freight port to customer, (4) U.S. duty, and (5) ADD cash deposits. Then, in the U.S. sales database, Unicatch reported the first four components of freight revenue as expenses to be deducted from the sales price. *Id.* at Exhs. C-12A (**CD 53**), C-13A (**CD 59**), C-18 (**CD 67**), and C-19A (**C-68**). Thus, Unicatch expressly advised Commerce that its customers were reimbursing Unicatch for ADD cash deposits, and at the same time did not report the ADD cash deposit component of freight revenue as an expense to be deducted from the sales price. Unicatch reported its revenue and costs in this manner because Commerce's policy, as affirmed by the courts, is that ADD cash deposits are not deducted from prices in determining adjusted sales prices. *See* **CD 295** (Unicatch Case Brief at 15-17).

In its Response Brief, the Government asks this Court to reject Unicatch's arguments. First, the Government directs the Court's attention to the fact that "Commerce has a practice of offsetting respondent's freight expenses with related freight revenues." Gov. Br. at 16. In discussing this practice, the Government does not acknowledge that Unicatch had advised Commerce that the expenses which it had included in the "freight revenue" field consisted of (1)

---

[3] **CD 71** (also in Unicatch's Section C Response at 33).

international ocean freight, (2) U.S. brokerage, (3) U.S. inland freight port to customer, (4) U.S. duty, and (5) ADDcash deposits. In other words, freight revenue included revenue realized by Unicatch in passing ADD cash deposits onto its customers.

The Government then argues that Commerce reasonably "found that antidumping duty cash deposits should not be part of the freight calculation for Unicatch," since: (1) "antidumping duties are not freight or movement-related expenses"; and (2) "Unicatch had not established that the gross unit price excludes the antidumping duties." Gov. Br. at 17 – 18. These arguments elevate form over substance and ignore commercial reality. The record in this case reveals that for certain designated sales, Unicatch charged its customers an additional fee for antidumping duty cash deposits, over and above the initial price paid for the goods. Thus, while Unicatch reported these costs in the same field as freight revenue, Unicatch also expressly advised Commerce that these costs consisted of ADD cash deposits. And the fact that Unicatch expressly advised Commerce that these costs were reported as part of freight revenue meant that Commerce also was advised that the gross unit price did not include antidumping duty payments.

Moreover, while Unicatch recognizes that each Annual Review rests on its own record, we submit that Commerce's failure toask that Unicatch further explain its reporting methodology constitutes substantial evidence that Commerce accepted Unicatch's representation that freight revenue included ADD cash deposits and that these deposits should not be deducted from unit revenue (unit price plus freight revenue). In this regard, Unicatch had reported ADD cash deposits in this manner in Taiwan Nails POR 2, in which Commerce accepted and verified Unicatch's submissions, and accepted Unicatch's reporting methodology by not deducting ADD cash deposits from the total price paid. *See Certain Steel Nails From Taiwan: Final Results of*

*Antidumping Duty Administrative Review and Partial Rescission of Administrative Review;*

*2016-2017,* 84 Fed. Reg. 11,506-01 (Mar. 27, 2019).

Finally, the Government's exhaustion claim should be rejected. Unicatch's position in its

Brief to this Court is identical to Unicatch position in its Case Brief to Commerce.  In the

Commerce brief, Unicatch reasonably assumed that Commerce's decision was a clerical error,

since Commerce had included ADD cash deposits as part of Unicatch's revenue in Taiwan Nails

POR 2 – a fact that Unicatch brought to Commerce's attention. Case Brief at 17-18. At that time,

Unicatch did not know, and had no reason to believe, that Commerce would adopt a directly

contrary position in POR 3, and if it did, Unicatch could not reasonably predict the basis for

Commerce's new rationale.  Thus, Unicatch could not possibly exhaust an argument that first

arose when Commerce issued its Final Determination.


**III.      COMMERCE'S SELECTION OF STEEL WIRE ROD PRICES PAID TO
          AFFILIATED SUPPLIERS TO CALCULATE "TOTCOM" IS NOT SUPPORTED
          BY SUBSTANTIAL EVIDENCE AND IS CONTRARY TO LAW**

In its Brief, Unicatch argued that Commerce's decision to exclude wire rod purchased by

Unicatch from [          ] from the analysis was not supported by substantial evidence since  (1)

taken together, Unicatch weighted average purchase price from its two affiliated trading

companies was higher than its purchase price from its unaffiliated vendors; and (2) [          ]

purchased wire rod from its unaffiliated vendors, and resold the wire rod to Unicatch at a profit.

In support of its position, Unicatch directed the Court's attention to *Notice of Final Results and*

*Partial Rescission of Antidumping Duty Administrative Review: Certain Oil Country Tubular*

*Goods from Mexico*, 71 Fed. Reg. 54,614 (Sept. 18, 2006), in which Commerce "defined the

market price as the affiliated resellers' acquisition cost from an unaffiliated party, plus selling,

general, and administrative costs, and financial costs."

In its Response Brief, the Government argues that it properly exercised its discretion to reject the lower priced purchase and accept the higher priced purchased rather than weight averaging the two prices, since this had been Commerce's practice when faced with analogous facts. However, the fact that Commerce has discretion to administer the antidumping duty law and has exercised that discretion in a particular manner in the past does not constitute sufficient reason for this Court to affirm Commerce's decision. Commerce needs to establish that its practice is reasonable. In this case, it is not. A decision by Commerce to include an above-market purchase price from affiliated vendor in its analysis, while at the same time excluding a below-market purchase price skews the ultimate result. If a low price is excluded because it is below market, then a high price, which is above market, should be treated in the same manner. It is not reasonable for Commerce – which is required to calculate margins as accurately as possible – to fulfill this statutory mandate by adopting a "heads I win – tails you lose" methodology.

Finally, the Government's Response Brief does not address the second legal issue raised by Unicatch; that is, that Commerce's decision failed to consider the fact that [          ] sales price to Unicatch exceeded that company's purchase price from unaffiliated vendors. Unicatch directed the Court and the Government's attention to the fact that Commerce had utilized this test to accept affiliated party sales prices in prior cases. The test is reasonable, since it confirms that the price paid is at market value. Commerce's failure to apply this test in this case renders its decision contrary to law.

## CONCLUSION

For all of the reasons discussed in Unicatch's initial Brief and summarized above, Unicatch respectfully requests that the Final Results be remanded to Commerce with instructions

11107606_1

to grant the relief requested and to provide such other and further relief as this Court deems just and appropriate.

Respectfully submitted,

*/s/ Ned H. Marshak*
Ned H. Marshak
Max F. Schutzman
Dharmendra N. Choudhary
Andrew T. Schutz
Eve Q. Wang

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiff Reply Brief, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2007, is 2,565 words, less than the 7,000 word limit.

*/s/ Andrew T. Schutz*
Andrew T. Schutz

*Counsel for Plaintiff Unicatch*

Dated: May 7, 2021